25 October, 2010 Good morning. Please be seated, Council. Before we hear our day calendar, we have a number of motions calendared for today, but only one of which is scheduled for argument. Scott's Miracle-Gro versus our Query, if we could hear from Council on that matter. Thank you, Judge Raji, and may it please the Court, Sean Regan, on behalf of the Scott's Company's Defendants' Movements. I understand the Court has given each side five minutes for argument. With the Court's permission, I'd like to request one minute for rebuttal, if I may. We usually don't have rebuttal on motions, but we'll allow you to take the one minute. Thank you, Judge. Your Honors, the Court should grant interlocutory review here because the issue presented is important to numerous cases. It satisfies the elements of 1292B, and it's very likely to continue to evade traditional post-judgment review. The District Court held below that statutory damages are an available remedy in a federal court class action brought under Sections 349 and 350 of the GBL. However, the Court erred in three important ways. The Court erred in phrasing the threshold question as whether those statutes on their property have statutory damages in a class action. The Court erred in finding that it was constrained by Shady Grove to conclude that such damages are available in federal court, and the Court erred in applying the second step of the eerie Shady Grove analysis insofar as it found damages available because the state legislature had, as the Court said, relied on CPLR 901B to make them unavailable. The District Court properly found this issue satisfies the elements of 1292B. The Court should take this appeal now for several reasons. It presents the Court with a fully ripened, pure question of law. As the District Court found with respect to this particular case, resolution will substantially affect the methods of proof and the amount of damages. But beyond this case, this issue has significant precedential value. It's an issue that is recurring, not just with respect to 349 and 350, but with respect to generally the application of Shady Grove, yet it continues to evade review. The reason for that is the hydraulic pressures that are implicated by the availability of statutory damages in a class action. There's no benefit to waiting for a more traditional post-judgment review, and there is considerable downside. Parties will continue to deal with those kind of pressures, and the result, as this Court has recognized, has been to lead to parties entering into settlements that are unmoored to potential actual liability and risk. Courts within this circuit lack clarity and have struggled, candidly, with the scope and application of Shady Grove. I think that's manifested . . . What courts in this circuit split on the issue? This particular issue, the narrow issue that we have raised, hasn't been litigated in large part because most of the time, these cases have settled prior to or as part of a class certification or right after class certification. It's become, as we've said, there are . . . and as not just we have said, but other data and research have shown, the federal courts have become a magnet for these kind of cases. This issue hasn't had a chance to rise up. In that sense, this is . . . There's no reason to take it. The fact that the issue is generally resolved by other means in the district court doesn't mean that we should be looking for a reason to take it. What's your other argument for why we should view this as a matter that needs to be addressed interlocutorily? Generally, the circuit has not, as a number of other courts have observed, Judge Garofas most recently in the Delgado case, a case that just came out about 60 days, less than 60 days ago, fewer than 60 days ago. The circuit has not had an opportunity to opine on the proper application of Shady Grove. Shady Grove really has been dramatically misconstrued. Shady Grove . . . That is not enough of a reason. There are a whole host of legal issues we've never had an opportunity to address. We don't go looking for it. What is it about your case that warrants us hearing this now? I think it is. As the court has taken other cases—Hevesi is another example—these kind of hydraulic pressures related to settlement, the importance of the issue, the pervasiveness of the issue, and the fact that those circumstances have led, demonstrably, to parties entering into any reasonable risk or any actual properly founded risk assessment. It is in the interest of the court to address that issue, we believe. Do you want to reserve a minute? I would, please. Thank you. Good morning, Your Honors. May it please the Court. I'm Scott Bursar for the Respondent, Michael Arcuri. I'd like to begin by answering Judge Livingston's question, is there a split in the district courts on this question? The answer, of course, is there is not. We cited in our opposition five district court cases from the Southern District of New York and other district courts within the Second Circuit. All five have answered this exact question in exactly the same way, which is all five have found that post Shady Grove, statutory damages are an available remedy in class actions under New York's GBL 349 and 350. And the reason, of course, is because, as the Supreme Court explained, in Shady Grove, Federal Rule of Civil Procedure 23 preempts Section 901 of the CPLR, which would otherwise restrict the availability of that remedy. The other reason, I think, which was clear even before Shady Grove is that under Rule 23, class certification can neither enlarge nor abridge the substantive rights of the litigants. And so, if a remedy is available to an individual litigant in an individual lawsuit, that same remedy under Rule 23 and under the Rules Enabling Act must be available in a class action. That is why the district courts have not struggled with this question. The district courts have uniformly answered this question correctly and the same way. And I'll point out that this— —Counsel's point that the realities of this kind of litigation mean that our court would never have an opportunity to review that decision. —I disagree with that, and I think that this Court has looked at the issue twice post Shady Grove in 2015 and in Gold v. New York Life in 2013, and we cite both of those cases in our papers. Now, to be fair, this Court wasn't squarely presented with the issue the way that the Scotts Company is trying to tee it up on this appeal. But in both of those cases, this Court and the litigants acknowledged what is self-evident under Shady Grove and under the very text of the GBL, which is that the GBL provides for a statutory remedy, and post Shady Grove, that remedy is available in a class action. So I do not think that it is an issue that has evaded appellate review, and I also don't think it's an issue likely to evade appellate review. I think the reality is that very few class actions are litigated to judgment, period, whether they involve statutory damages or not. And so there are very few class action judgments that come up to this Court or to any Court of Appeal. —Appellate pressure works in virtually every case. —Well, I don't think that's true, Your Honor, because in many of the cases, class certification is denied, and that's why Your Honors never see it. Or in many of the cases, the plaintiffs lose. So hydraulic pressure or not, I think these cases just ordinarily don't get litigated to judgment because they are so difficult. —In any event, you're saying that in Gold and Sykes, we more or less have dealt with this issue as a general matter, maybe not the specific issue, but as a general matter, the overall. —Gold and Sykes, I think between Gold, Sykes, and Shady Grove itself, the district courts have crystal clear guidance on what the rule is here. And that's why every district court to address the issue has gone the same way. And so when you look at that under the factors of 1292, one thing that the court would have to find to take this interlocutory appeal is that there is a substantial ground for a difference of opinion on how the issue should be resolved. And that finding cannot be made here when five times out of five, the district courts have gone the same way, and two times out of two, this court has acknowledged and ruled that those rulings are correct. One other element under 1292 that's missing here is that the issue is not a controlling one in this case because it will not resolve the case. It will not narrow the case. It will not materially advance the ability to resolve the case on a shorter timeframe. This case was set for a final pretrial conference in September of 2017, and this interlocutory appeal, this petition for interlocutory appeal, is causing only delay to a five-year-old case. And no matter how this court rules, if it were to take the interlocutory appeal, no The case would still have to proceed to trial on the same evidence, so it's not a controlling question. It will not materially advance the case, and there is no substantial ground for difference of opinion. And for all those reasons, there is no grounds for this court to take the extraordinary step of not following the final judgment rule and hearing an interlocutory appeal in this matter. Thank you, your honors. Thank you very much. Regan, you have a minute. Thank you, Judge. If I may very briefly, on the issue of exceptional circumstances, the interim effect, as the district court found, the interim effect of combining statutory damages with a class action means it will continue to escape and evade review, Sykes, as the district court found, Sykes and Gold did not address this issue. This circuit has not had an opportunity to grapple with this issue. With this issue, the application of Shady Grove with respect to statutory damages, this isn't just a very isolated issue. We're talking about the general business law of New York, a statute that has become very attractive and has become a statute that plaintiff's firms are continuing to invest and sue under, candidly, in this court. Plaintiffs themselves have brought 14 cases, as we've cited, too. With respect to this issue, every judge who's dealt with it, Judge Weinstein, Judge Persetti, knows it's wrong. They're vexed by this issue, they know it's the wrong result. The reasons for that are set forth in this petition, and this is an opportunity to address this issue before it continues to go on and on, continues to evade review. We'd ask the court, take the exceptional step, the extraordinary step, unusual step of granting interlocutory review of this issue. Thank you. We're going to take the matter under advisement and deal with it and all the other motions on our calendar as quickly as we can. We'll turn to the day calendar. The first case being argued is Garner versus Lee. Thanks. If I may. May, counsel. Good morning, your honors. My name is Michael J. Miller. I appear on behalf of the appellant in this matter.  I would like to start out by focusing on the issue of whether or not the district court erred in its analysis of petitioner's ineffective assistance of counsel claim. The structure of the district court's decision shows that it used 2254D as a gatekeeper. Similar to a claim of, say, actual innocence, and I'll get to this again later, but similar to what respondent is arguing concerning Blumfield v. Cain. And used it as a type of default not to give or analyze deeply the state court's opinion, and then went on to determine whether or not after its own hearing, the constitution had been violated. This is all, of course, on Strickland and effective assistance of counsel. There's no question here about what the applicable law is that we're talking about. So, after it had went through this analysis, first of eliminating the use of 2254D, and then going to 2254A and using Lopez and I presume Blumfield to make an independent analysis, it then went on to find that, of course, the counsel was ineffective. We also disagree with that. However, we're much more interested in the federalism issue, not the effectiveness of Mr. Lemke. We believe he was, in fact, an effective attorney for his client, but the other issues are more important to other cases other than this particular one. First, the district court decision is wrong because it conflated unreasonableness under Strickland with unreasonableness application under 2254D1. Now I'm confused. Yes, sir. What is your principal complaint? Because you're telling us to focus on federalism. We believe that he was effective, but maybe there's a dispute about that. I think it's sort of like a three-tiered analysis. One is whether or not 2254D was correctly applied and whether it gave correct deference to the state court decision. And we believe that the court got that wrong for two reasons. One is it conflated the Strickland standard with the 2254D1 standard. In other words, unreasonableness or ineffectiveness under Strickland doesn't per se make out unreasonableness under 2254D1. That's the first part. Let's say we agreed with you about that, that the district court applied the doubly deferential standard erroneously. Setting that aside and focusing just on the state court record, not the evidence adduced at the hearing, what is the justification that an attorney would have for putting a client on the stand and failing to have obtained these cell phone records? Or after failing to obtain them, failing to prepare his counsel, his client, before offering his testimony on direct? Well, there are many different reasons for that. Among them being that we didn't, meaning the prosecution didn't have those records either. And- By the time they cross-examined your client. Right, but at that point, we did not have any opportunity to do in 2003 or 2004 whatever forensic analysis we could have done with those records. Well, but the point is, the question you're being asked is, how is it objectively reasonable for a lawyer to put his client on the stand without procuring those records, particularly in a case where the client asked that the lawyer procure the records? The answer to that is, and part of the information in that question comes from the hearing that was held in the district court. In other words, the conversations that occurred between the client and the attorney. All right, you can take that out of it if you want, but we're still trying to understand. To satisfy Strickland, you have to show that the court was wrong in assessing both objective reasonableness and prejudice. How do you justify the action here? I mean, it's not that I think you have no answers. If I understood it again, we may be from the hearing. He asked the mother to get them. We have a whole lot of facts here, but what is your answer to us? About how it was objectively reasonable for a defense attorney to act as this counsel did. Because it would have done him virtually no good in the presentation of his case and could have caused him harm. He had a complete story from his client about the times and where he was. We didn't have time to go through those records and assess them, get cell tower information if we could, where that phone might have been. We also know from the hearing, since it was brought up, that he was told that he had three different phones. That he was carrying burner phones because he was a drug dealer. He had an XTEL that worked as a walkie talkie. And he was originally told, according to the hearing, of course, that his wife had the phone. Be that as it may, he also knew, when he had those records, there was a lot of calls on them. And the argument he ultimately made with him, although his client was a little bit flummoxed about the times, was that the last outgoing call home was at 1031, and the shooting occurred approximately at 1040. So his argument in summation was, he was home. He probably had called his wife, this was the argument he made before the jury, that I'm running a little late, I'm on my way home. But we know that he made no incoming calls to his home after 1031. So his argument to the jury was, he didn't do that, there were many outgoing calls, because he was in fact home. So those records show a lot of things. What it doesn't show is who had the phone, where they were that they had the phone, and it does not actually establish an alibi because we don't know who had the phone. It would have possibly done him great harm if we had time to take those records and go through it and see if we could obtain any of this cell site information. Obviously, 16 years after the event, we don't think that that would happen at all. Although, of course, now Mr. Lemke has testified. And at this point, there is no attorney-client privilege left. And in the future, if this would be retried, I don't think our position would be that that cell phone was necessarily at the scene. Since we now know for the first time after this hearing that he had at least three cell phones, maybe more. In fact, Mr. Lemke said he had burner phones, presumably because he was a drug dealer. So everybody is fixated on these records, but it really would not have helped him. He presented a cogent argument that his client was home. Those records don't dispute it, then they don't say where her phone was. So- The records disprove it. The records disprove that story, because they show him calling his home. Not at the time of the shooting. I mean, Judge Chen went through an entire analysis that suggested that the record disproved the prosecution theory. No, it really doesn't. We could live with any time frame there. I mean, the time- The prosecutor's time frame was 10 to 1025. Right. But the fact- Call, the 911 call comes in at 1041, do you agree with that? Based upon the record that we had, yes. But what we didn't have at that particular time was any reason to go out and ask them specifically, they went outside, they walked down the street, did they discuss it with their wife? Did they have to put out pants before they went outside? So we don't know precisely what that timing is. Okay, but as a matter of making strategic decisions, both on the prosecutor's side and on the defense side, doesn't that have to be informed by facts? So don't you need to see the cell phone records before making- That would all depend upon the discussions that Mr. Garner had with his attorney. All right, thank you, counsel. I know you want to reserve time for rebuttal. Let's hear from your adversary. May it please the court, Norman Trabulus for Mr. Garner. Addressing the question that Judge Laquier said, there was, on that tape, there was also a reference to a second 9-11 call, and Mr. Lemke had that. It wasn't played for the jury. The tape indicated it came, on the tape itself, it indicated that it came in at 1046. That caller said that the shooting had occurred five or ten minutes before. It was clear to everybody that that shooting had occurred at 1041 or sometime shortly before that. What Mr. Lemke- I'm concerned about that. As I understand it, the exact times are not in the record. The exact time can be- Being off even two or three minutes on some of these times would upset the assumptions that the district court made. Where in the record are the exact times? I mean, your client has the burden on it. Where in the record of the trial or of the- In the record before us. Okay, in the record before you, the tape itself was heard as introduced in evidence at the hearing. And I made a photocopy of what the face of the tape, and I'll read it to you. And if anybody wants just to see the photocopy, the back of this says Exhibit 2, but I didn't make a copy of that. At the hearing that the judge held. And it says 1, close friend, call to 911, and then it says ECO number 825-25 at 2241 hours. And then it says 1, close friend, call to 911, ECO number 764 at 2246 hours. How can we know what time that was placed? But the call says five minutes and all that. If they're off by even a few minutes, it upsets the conclusions you're urging. I don't- I mean, trial records are replete with people being off a few minutes. Yes. In their estimates. But let's get back to this, the question of counsel's ineffectiveness. Presumably, you're not arguing that counsel should have procured the records in order to impeach his client, you were urging procurement of the records to corroborate his client, right? Either to corroborate the client or for the independent value they may show as to what his client was doing at the time. All right. One or the other. And both. The fact is that it would have shown that he wasn't at home at a particular time because he was calling home, right? That's what the prosecution used it for and it was deemed very effective impeachment. Yes, that's one thing that it would have shown. Now, to the extent we start first with objective reasonableness. At the hearing before Judge Shen, it became out that defense counsel had asked the mother to get the records. Because the phone was in her name, correct? She, he did not ask the mother. He asked Mr. Garner to get the records through his, get the records and that was through the mother. Why wasn't that, why wasn't that objectively reasonable? I mean, it was, it would have been faster if they'd acted than a subpoena. So, how can we say that it was objectively unreasonable for counsel to have sought the records that way? I think it's objectively unreasonable for counsel to have sought the records that way and in any event, when they fail to show up- You think it, but why should we? I mean, is there a case that says that you can't rely on your client for within his means of procurement? Client doesn't have subpoena power. Perhaps initially it would be- They were his mother's phone records, and I'm asking you why that wasn't, why that wasn't at least objectively reasonable for counsel to say, have your mother get her phone records. Initially it could have been objectively reasonable, but to continue to rely on it when the records don't show up and to proceed to trial without the records, that's objectively unreasonable. Is there any case law that supports that view of counsel's conduct? Well- And you not only have to procure evidence, but if you don't procure it by one means, which could have been reasonable, you are constitutionally obliged to use other means. I'm just asking whether any court has dealt with that scenario. Specifically, I don't know, Your Honor, the decision that's cited by Judge Chen, the Velasquez decision, which is a district court decision decided by Judge Bianco. It does deal with obtaining cell phone records, but frankly, Your Honor, I don't recall the facts clearly enough. Certainly, it would seem to me that there are US Supreme Court cases that say that a mistaken belief that records are unavailable does not excuse a failure to obtain them when those records are in fact available. And in this case, I would analogize to those cases because when the records don't show up, he's got to pursue it further. So those records are important, as Your Honor said, particularly when the defendant asks for them, and particularly when they show they have the potential for showing what was happening at the time of the crime. So those- Let me ask you this with respect to prejudice. Can we assume that if the records had been obtained, the defendant wouldn't have taken the stand to testify that he was at home? I don't know that that can be assumed. Well, he would have been impeached then. And I'm just asking this because to the extent there's prejudice here, there's prejudice by the fact that he was cross-examined in a way that showed that he was not telling the truth. If he had not taken the stand, however, what the jury would have been left with was the victim ID, the victim's money in your client's car, and the phone links between the defendant and the victim. It hardly seems to me likely that your client would have been acquitted without his story, which then turned out not to be true. There's one more thing that would have been there, which is the phone records themselves, which showed what the defendant was doing continuously on the phone from 1041 on up until, excuse me, from 1031 on up until 1041. And, your honor, I would submit that there was a reasonable probability that had the- You said your client was there at the scene of this shooting, that his car is riddled with bullets. I'm sorry? That his car has been shot at, that he has the money in the car, and that he lies to the police officers afterwards about which car he's in and what he's using. Isn't that so, or have I misread something? The car isn't riddled with bullets. Well, but it's shot out. I don't believe so. Weren't there shootings at the car? I don't believe so. I'm not familiar with that. Did I misunderstand that? I think your honor did, your honor. And I also, I mean, that would put multiple bullets, that would put multiple guns at the scene, which in fact would raise another question as to who may have shot. But on the question of how strong the evidence was in assessing prejudice, the victim testified that your client was the shooter. The victim's testimony matches with the cousin's account of how they ended up in this place together, according to the victim's story. Your client's story is diametrically opposed both to the victim and to the cousin. And your client's car ends up with the money in the glove compartment, if I'm remembering correctly. That's a pretty strong case. I agree that it's a strong case, but it's refuted because the 911 calls. Now, Judge Raji has indicated that there could be some potential difference at two or three minutes here. The 911 calls make it quite clear. You have a guy who just came out, calls at 1041, he said he just heard a loud bang, and he comes out. That's at 1041. You have the other caller, which could have been brought to the jury, saying at 1046 it occurred five or ten minutes before. It's pretty- And I'm just trying to make sure I understand the trial record accurately on that. That evidence was not before the jury. That tape that you alluded to earlier was before the habeas court, the court below. The second call was not before the jury. The first call was. From the first call and from the sequence of, from the first call, it would be quite possible to show that the shooting must have occurred. And Judge, assuming that the caller spoke within minutes after, made the call within minutes after the shooting, which is certainly an indication from that. The shooting must have occurred just certainly, it would not be reasonable to assume that it was more than ten minutes before 1041. And that was the basis of what Judge Chen found, that she made a finding which was not challenged on this appeal, that it occurred during that time period. And from that finding- It's challenging whether she should have been making such fact findings at all. Well- That is part of the challenge to how she approached the habeas. It's a challenge to whether she applied Richter and Pinholster correctly. But in terms of that particular finding, the factual accuracy of that finding has not been challenged. The only challenge is the standard that was applied in making it. The factual findings here have not been disputed. They weren't even, that finding wasn't even disputed on the 440 motion. That's why your adversary has told us to focus more on the federalism issue, as I understand it. That's why your adversary has urged us to focus on the federalism issue, which is the issue of greatest concern. But I- Go ahead. I thought that your argument rested on the fact that the prosecution's theory was that the events occurred between 10 and 1025. Is that correct? In the prosecution's theory of trial was that it occurred between 10 o'clock and 1025. That is what the prosecutor argued. In that if the cell phone records in the 911 call had been reviewed and so on by counsel, it would have at least provided some reasonable probability that the jury would have been convinced that, in fact, the shooting had occurred sometime between 1031 and 1041, is that correct? Yes, and even closer than that, tending towards closer to 1040. And that during that period between 1031 and 1041, your client was continuously making calls, at least three calls, is that also correct? That's correct, Your Honor, and you have- But none of that was, that theory was not made available to the jury, because counsel did not review the cell phone records, did not think about this, did not do anything in- Correct, and worse still, Your Honor, the counsel argued his own false alibi to the jury by saying that the crime occurred at 1052. Around 1052, and that was demonstrably false, and that in and of itself was prejudicial under Revis and under Henry V. Poole. He took the, Mr. Garner, who testified that his recollection at the time wasn't very good, he said he figured, he was guessing. He had been made to look like he had given a deliberately false alibi, and then Mr. Lemke came and made it, and came up with his own clearly false alibi. Why he just changed the time to an impossible one, and argued that Mr. Garner wasn't there. But in terms of how strong the case is, a couple of other things. Why did the victim, who had shown the capacity to fabricate when speaking to the officer at the scene, he said that he had played dead. He also failed to mention his cousin, Merkelson, who had given him the money and was waiting for him. Even though he said that he wanted his parents called. Why did he tell the police officer when Mr. Garner called him, as he admitted he did, and it showed up as blizzy. Why did he tell him? Don't answer. That's very strange. You're just given a detailed description of Mr. Garner, which was an accurate one, for the purposes of getting him apprehended. That was very strange. That itself could, detracted from some of the other, what might be some of the other strength of it. I mean, it sounds like he doesn't want Garner's, and the officers speaking to each other, perhaps Garner could establish that he was with somebody and had been for some period of time. I mean- Can I ask, going back to the cell phone chronology for a moment, this evidence about the argument that the cell phone records would place the shooting occurring between 1031 and 1041, if considered together with the 911 evidence. That wasn't before the state court. So we can't look to that in assessing whether the double deferential standard has been met here, right? No, it was before the state court. It was raised in the 440 motion. The state court didn't address it. It pretended that it didn't exist. That same chart that appears in Judge Chen's opinion was presented to the state court. And the state court had access to the recordings. It ignored them. The recordings, so the recordings were in the state habeas record? Yes, absolutely. They were in the, and that same argument as to the prejudicial, the fact that there was exculpatory evidence in there was presented to the state court. State court simply did not address it at all, which itself was to be unreasonable in a- Let me be sure I understand what you're saying here. Yes. In footnote 27, Judge Chen says, the exact times of the 911 calls are not in the record. Now, is she incorrect about that? There is no testimony that what she, I think what she- She says they're not in the record. But they're deducible from the record, and that's- But she didn't deduce them. Yes, she did. What she did was, she said the court credits petitioner's argument that approximate times can be discerned based on the submitted evidence, which is other evidence, not the 911 calls. She says a minute and a half into the first 911 call, the operator told the caller that the police were already on the way. And Gover received information to respond at 1044 PM. And from that, she discerns that the call could not have occurred prior to 1041 PM. Of course, that assumes that when the 911 operator said that, that the call had in fact been placed to other officers, and that the officer who got the first call was Gover, not someone else. This is my point about how even a minute or two off starts to change these things. Because the judge then goes on to say on the second 911 call, the caller indicated that the shooting happened five to ten minutes prior to her call. Crediting that estimate, and assuming the call occurred ten minutes before, then the shooting could not have occurred any earlier than 1031. But if that caller was off by even a few minutes, it would have been a difference. Because your client's first call is 1028 PM, as I understand it. So three minutes earlier. And it wouldn't have been unreasonable once he shot someone for him to be so stunned by that that he's on the phone now calling people. So I'm very troubled by this notion that these times are so precise that your client was obviously prejudiced. What am I missing here? Well, Your Honor, the tape itself, which was in evidence at the trial, and certainly was presented to Judge Chen, says specifically, one call to 911 at 2241 hours. Now, does that mean 2241 in 50 seconds or 2241 in one second? We don't know. The other one says, one call to 911, that's the second call, at 2246 hours. So that's pretty exact. And it may be that Judge Chen, that's part of the record and is there. And that's what was on the tape itself. It is true that there was no witness who at the trial said that 911 call came in at 2241. Or that there was another one at 2246. Well, Judge Chen from her other means says 1041. But then there's the question of, when does the shooting happen? And the callers is the only basis for that, that it's five to ten minutes before her call. But if it's any more than that. Well, that's the second caller. That's the second caller. And the first caller said he had just heard a loud bang came outside and it's 1041. So are we talking about something that when he says that he heard a loud bang came outside, he was still afraid that he himself might be shot? Is that something which would indicate to you that it was more than ten minutes ago? The point is, what is important here is whether there's a reasonable probability and not a certainty. It doesn't even have to be more likely than not. It certainly would have raised a reasonable doubt in the jury's mind. Certainly, it's an unusual case where you have a witness who's testifying that I know this person and he shot me. And is saying that to a police officer shortly afterwards. But you've got something which is totally inconsistent with it. And tends to show otherwise, that he was on the phone at the time that this guy said he had never been on the phone for 25 minutes before the shooting. And he was actually making a whole bunch of calls at the time. So I think, and by the way, the entire premise of the prosecution, since it had been mentioned as to who had the phone, was that Mr. Garner had the phone. Maybe if they get another opportunity to try Mr. Garner, they'll take a different tack. But his cross-examination, the entire evidence against him was predicated on him having that phone before. And by the way, it's only a single phone. There's a landline at home, and there's a single phone, which is both a Nextel and can be used as a phone. It's not two separate phones. I just ask, this is turning to your adversary's argument about the misapplication of Richter. I mean, our language in Monroe about the increment of error need not be great. Isn't that inconsistent with the Supreme Court's subsequent decision in Richter, that the error must be so lacking in justification that it was beyond any possibility of fair-minded disagreement? Even if it is, and I think the language is it, this case meets the Richter standard. Just like Rivas did, which cites Richter, which was a false alibi case. Just like Henry V Poole, which I think preceded Richter, but also meets it. When you've got a false alibi, according to Henry V Poole, just the effect on that would be sufficient of that, where a lawyer knowingly presents a false alibi, prejudice results just from that. And in this case, yes, the prosecution's case, absent the effect of the phone records, was a strong one. But what you've got with those phone records is something which, in my experience, well, we all have our own experience, obviously. Certainly, it is fair to infer that there is a reasonable probability that the verdict would have been different. Because you've got something which is impossible based upon, would the jury have tried to reconcile it? Maybe, but maybe not. The times are quite clear. If the court wishes to have that- Am I correct, and I've spent some time with the trial record, I'll spend some more time with the record. But your client's argument at trial as to motive for the testimony offered by the victim against him amounted to confusion resulting from the shooting itself. Yes. At trial, the lawyer, Mr. Lemke, said that Mr. Carl Keith, the victim, had a vision. And it must have been a hallucination. Well, I don't think that's a very good strategy, but leaving that aside, it would not have been inconsistent with that to point to the phone records and say, yeah, he must have had a vision because the phone records show that my client was doing something completely different than he said. Just understanding how this trial took place, but that approach was inconsistent with the cousin's testimony also. So that defense, in a sense, was impeached by the cousin's testimony. Well, I'd like, yes, and it was. There were some things about the cousin's testimony, a couple of things about the cousin. There were some inconsistencies between the cousin and Mr. Keith in terms of which parking lots they'd gone to and how many. And I'd actually made something of that in the state court proceeding, but I mean, that is not at the heart of this claim. They were impeachable. And there was also further impeachment done about the fact that there was a third person there, a guy by the name of Ryan Palmera who- And this is your theory today. It's not my theory today. I'm just, I think Judge Livingston was asking me about respects in which things were impeached. And I wasn't entirely sure where Judge Livingston was going with that, but I wanted to point out that there were things that tended to impeach Mr. Merkelson. So to the extent that Mr. Merkelson's testimony impeached the vision, yes, it did. And it made the vision defense all the less credible and all the less tenable. And the other thing about Mr. Merkelson is that it is peculiar that the phone started ringing. Mr. Keith's phone started ringing, ringing, ringing, and the first 911 caller said it, and Mr. Keith himself testified that he remembered it. And it wasn't Mr. Garner who was making those calls, because Mr. Garner was making other calls at the same time as his phone records show. He was not, so it was somebody else suddenly got wind that something got wrong, which suggests to me that maybe Mr. Merkelson was around the corner as the deal went by, heard a shot, was afraid to go there, and called it. That's just my possible theory. Thank you. Thank you, Your Honor. Mr. Miller, you're reserved a minute. Thank you, Your Honor. A few quick points. Defense counsel had asked, through his client, for the mother to get the records, went there to court. There was a discussion at the start of the proceedings at the trial level about the people obtaining those records and what they were going to do with them. His assessment at that point, whether or not he was going to ask for an adjournment, of course, brings into play all his interactions with the court, the judge at the trial level, the prior conferences they had, and was, of course, partially based upon his assessment of what that judge was going to do at that point. So it's very difficult to say that he could have simply gotten more time to then subpoena the records. He may have been looking at a situation where he knew he was going to trial that day and was trying to make the best of it as well as he could. That's the first point. Second point is, the question came up of what would have happened with those records if the defendant had not testified and there was an answer, what would be put into evidence? I don't know that that's correct in any shape or form. We used them to, of course, examine the defendant, whether or not they would independently go into evidence. They would have to be, even if they were certified in some way to get around the fact that they were correct. Your adversary says that you don't challenge the, as I understand it, the facts of the cell phone records. Is that correct? That is the timing? That the fact that the 9-1-1 evidence establishes that the shooting occurred between 1031 and 1041. I was trying to adhere as close as I could to the state court trial record without guessing or employing. Your adversary says you don't challenge that fact. I don't challenge it because there was nothing in the state court record to challenge it. In any event, those records- I know what that means. Does that mean that therefore you don't accept Judge Chin's characterization of the murder as having happened between 1031 and 1041, or that you do challenge that? I mean, you can challenge it on various grounds. I'm just trying to understand what- Based on the state court record that exists, I cannot challenge that. So you accept it? Based upon the state court record at the trial level, yes. But the point of the matter- Do you think the state court trial record supports that conclusion? I think it supports that conclusion to the extent those were the arguments that were made essentially in summation. The prosecutor argued that the shooting occurred sometime after, actually after 1028 because there was a block of 20 minutes where no calls were made on that phone. Which coincided with the testimony of the victim that while they drove, there were no phone calls. It takes about 20 minutes to get to the location. So it would have to have been sometime after 1028 PM. Defense counsels argued, well, defendant last call home was at 1031, and if he tried to move the time back a little further to 1050, but the fact of the matter is the argument was essentially after that, he was home. So they both used those records, but it was inconclusive about precisely what they showed. The point I was trying to make is if the defendant did not testify, those records probably would not have gone into evidence at all, contrary to what counsel said. The third thing is, fourth thing is, Mr. Tribal has testified here, essentially, that there were two phones. One phone having both the next tell and the phone qualities. That's nowhere in the record. That's new here today. And finally, Merkelson, I do not believe, based upon the trial record, actually identified who his cousin drove off with. There were two meetings. They met, he met the defendant, the defendant left, presumably went home to change his clothes. A different car then met him at the second parking lot. And my recollection of that testimony, and of course you have the record, is that Merkelson said, I did not see who was driving the second car. So the way that played out in our theory is that Merkelson remained in Nassau at the Home Depot. His cousin took a ride he knew not where. It's not at all surprising that when he didn't return, he started to call to see where he was. It's also not at all surprising that he wasn't immediately running to the police because the last thing he knew, he was making a drug deal. Thank you. Thank you very much. We're going to take the matter under advisement. We'll try to get you a decision as soon as we can. The next case being argued, Schlafler versus Merrill Lynch. Our colleague, Judge Royer, has to recuse himself, so he'll step out and pursuant to our local rules, Judge Livingston and I will hear the argument in this case. Ms. Schlafler? Yes. Not at all. The gentleman made me, I'm Dr. Schlafler. I'm parole say, but I have a law degree. I'm just not a member, I have a jurist doctor degree. I'm just not a member of the bar. I have limited time. I would like to ask the court to reinstate my claim. And re-send it to somebody else, re-send it. Or because I find Judge Roman was at fault for this. He's corrupt. He's biased. He spoke to me in a sexist manner. He just sort of went around. He doesn't know what the case is about. And he manipulated, there was very little action. There were two hearings in which the conversation was vapid, very vapid. Had nothing to do. I was robbed, not by guys on the street corner, but by all people with law degrees. So this is a serious matter. It's not only a serious matter because I lost all this money, but it's a serious matter because who is doing the stealing? And I had tried to, how I found out that Bank of America Investments had stolen my money, essentially, because the thief left it there. They laundered it for him. They changed it. And he continued to do that for at least 12 years. It's not sort of a speedy thing. And so when I asked him to, when I brought up some conversations about that, he just went on something completely different and refused to include the witnesses. And nothing, nothing. It was just nothing. The fact that he dismissed it, and before he dismissed, he told the defendants that he would decide whether a witness that I had, he allowed that I could ask for the witness. When he gave that, the time limit, he said, on his way out, he told the defendants that he will decide the case before my request is handled. I mean, you know, this is not what the Constitution has guaranteed me. You do understand that the basis for the judge's ruling in dismissing your case were principles that, as a lawyer I know you're familiar with, of res judicata, collateral estoppel, and the statute of limitations. Do you want to take the minute you have left to tell us why the judge was wrong in reaching those conclusions? Well, why the judge came to those conclusions? Well, not why he came to them, but why you're saying he's wrong. Because the statute of limitation is not true. The statute of limitation in California, in a civil act, is four years. I found out who stole my money, like, two years after I found out, I claimed it. So you have four years from the time you find out. You find out that Joe stole it, then you have four years to go. It was beyond criminal prosecution. And I scouted all of Northern California to get some criminal relief. But that civil is something completely different. So it was not the time. And I found out from the person that laundered the money for Bank of America Investments. All right, Ms. Shafflin, now you want to use a minute to rebut what your adversary says, right? Pardon me? You want to reserve a minute for rebuttal. Yes, yes. All right, so we'll hear now from your adversary. Thank you. May it please the court, Michelle Mello on behalf of Appellee Merrill Lynch, Pierce, Fenner, and Smith, Incorporated. The district court properly granted Merrill Lynch's motion to dismiss Appellant's first amended complaint based on race judicata, collateral estoppel, lack of subject matter jurisdiction, statute of limitations. And if the claims were not time barred, they would be subject to dismissal for failure to state a claim upon which relief can be granted. The district court also acted within its discretion in finding that Appellant is a vexatious litigant. And by enjoining her from filing any new actions in the Southern District of New York without attaching a copy of the district court's order to any future case initiating papers. Appellant filed this lawsuit in 2015 following the dismissal of a substantially similar lawsuit in 2014 by the district court for the Northern District of California. In both lawsuits, Appellant alleged that Merrill Lynch acted with a third party to steal and convert certain stock certificates. In doing so, Appellant ignores that the disposition of those very same stock certificates was adjudicated in a related bankruptcy proceeding in which the bankruptcy court authorized their sale. That was in 2001. Appellant attempted to challenge the subsequent sale of the stock certificates on numerous occasions, all to no avail. And the bankruptcy case was ultimately closed in 2010. Nevertheless, Appellant attempted to challenge the sale of the stock certificates, again, this time by suing Merrill Lynch first in California, and when that case was dismissed here in New York. The district court's order should be affirmed on four grounds. First, the district court properly dismissed Appellant's claims against Merrill Lynch as barred by the doctrine of res judicata, based on the dismissal of the California action, which adjudicated the same and similar claims against the same party and resulted in a final judgment on the merits. In both cases, Appellant asserted causes of action for breach of fiduciary duty and negligence in connection with the same alleged injuries and the same alleged wrongs. All relating to Merrill Lynch's role in the disposition of the stock certificates. Those claims were dismissed for failure to state a claim. Appellant's addition of fraud, conversion, and conspiracy claims in this action does not change the focal point of her complaint in California. And all of those claims could have been brought there. Second, the district court properly dismissed Appellant's claims based on collateral estoppel and lack of subject matter jurisdiction to the extent that they seek to challenge and reopen the bankruptcy proceeding. All factual and legal issues relating to the disposition of the stock certificates at issue here were adjudicated on the merits in that proceeding and affirmed on appeal, such that another attack on the sale of the stock certificates cannot be pursued in a further proceeding. Third, the district court properly dismissed Appellant's claims as time barred. This lawsuit was not filed until 2015, well beyond the applicable two to four year limitations periods for the claims at issue, which arose from events that transpired almost 15 years prior. And there's no basis for any tolling of those limitations periods. Fourth, the district court properly ordered that Appellant's claims, were they not time barred, they would be subject to dismissal for failure to state a claim upon which relief can be granted. Based on the allegations in the First Amendment complaint and the many judicial records from the prior proceedings, there is simply no potential for a reasonable inference that Merrill Lynch is responsible for any of the misconduct alleged. Moreover, the First Amendment complaint does not state facts sufficient to constitute any cause of action against Merrill Lynch. For all of the foregoing reasons, the district court's order should be affirmed. I would be happy to answer any questions that the panel may have, but otherwise we'll submit. Thank you. Thank you. Rabbi Schaffer, you have a minute to respond. Your Honor, ComputerShare had been the one that laundered the money once it was stolen from me, and it was used by the thieves. ComputerShare has been doing, did that for 12 years. Thereafter, was doing their money. I had left California long ago, and he was clearing their money, selling stocks and whatnot for 12 years. He was the one who alerted me. He was the one. So it was not that it was time limited. It was not. And Judge Roman didn't allow ComputerShare to be introduced. And that is part of his, I believe, corruption. I have a constitutional right. Did you know that corruption is a very strong word and does not equate to error? I mean, judges can make mistakes without being corrupt. Your Honor, when you are- Well, it's just you've used the word twice. Yeah, I've used it twice. I'm sorry. But when you are with people that know the same thing you know, and they are ignoring what that thing is and make you feel that you are just hallucinating, that is pretty, I believe, corrupt. All right. Thank you very much. We're going to take this case under advisement. We'll try to get you a decision quickly. The other two cases on our calendar are submitted, so we stand adjourned. Thank you very much. Court is adjourned.